Filed 7/21/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EAGLE COLTON 55, LP, et al., | D087799 |
| Plaintiffs and Respondents, | (Super. Ct. No. CIVSB2428667) |
| v. | |
| CITY OF COLTON et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Bernardino County, Wilfred J. Schneider, Jr., Judge. Reversed and remanded with directions.

Allen Matkins Leck Gamble Mallory & Natsis, Patrick E. Breen and Gabriela S. Perez for Plaintiffs and Respondents.

Aarvig & Associates, Aarvig Pennell, Maria K. Aarvig and Diane K. Huntley for Defendants and Appellants.

The City of Colton, Colton Housing Authority, and Stacey Dabbs (collectively, Colton) appeal from an order of the trial court denying a special motion to strike the complaint under the anti-SLAPP statute,[1] Code of Civil

---

[1] SLAPP is an acronym that refers to a Strategic Lawsuit Against Public Participation. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1242.)

Procedure section 425.16.[2]  Colton urges that the motion should have been granted since the allegations in the complaint filed by Eagle Colton 55, LP; Eagle Real Estate Investment Group, LLC; Eagle Yucaipa 55, LLC; and Eagle Oaks, LP (collectively, Eagle) concern Colton's protected activity of developing and financing a senior housing project.  Colton also argues that Eagle is unlikely to prevail on its claims because they are barred by the Government Claims Act, Government Code section 810 et seq. (the Act), and they have no factual or legal support.  Following de novo review, we agree that Colton's anti-SLAPP motion should have been granted as (i) Eagle's claims concern Colton's protected activity and (ii) Eagle failed to comply with the Act's claim presentation requirement and thus is unlikely to prevail on the merits.  We reverse and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Colton's Senior Housing Community*

In 2012, Colton entered into an agreement with Eagle for the entitlement, development, construction, and management of an affordable senior housing community.  As part of the agreement, the parties executed a promissory note secured by a deed of trust, which included a $2.5 million loan from Colton to Eagle.  The note required Eagle to make annual principal and interest payments based on a percentage of "the Residual Receipts from operation of the Project each calendar year."  Eagle was also required to provide Colton "a Residual Receipts report in form and substance reasonably acceptable," including "annual financial statements with respect to the Project that have been reviewed by an independent certified public

---

[2]  Further undesignated statutory references are to the Code of Civil Procedure.

2

accountant." Additionally, Eagle's certified public accountant was to provide "an expressed written opinion . . . that such financial statements present the financial position, results of operation and cash flows of the Project fairly and in accordance with generally accepted accounting principles."

In 2016, Stacey Dabbs became Colton's finance director. That same year, Colton's independent auditor issued a report identifying "certain deficiencies in [Colton's] internal control" that it "consider[ed] to be material weaknesses." The report noted Colton was not monitoring Eagle's compliance with the note. It recommended Colton "establish monitoring procedures" for Eagle's "compliance with loan agreements and necessary actions should be taken" if it was not compliant. The auditor's 2017 and 2018 reports repeated the same recommendation.

In 2017, Eagle provided Colton its 2016 financial statements with a letter from an accounting firm stating it was "asked to provide some independent CPA commentary." The letter acknowledged the firm had "not performed the required procedures, analytical and otherwise, that would be necessary to issue an accountant's audit, review or compilation opinion letter." It further noted, "Since we did not perform any of the procedures required for an independent accountant[']s 'opinion' letter (as required for an audit, review or compilations), this letter is not intended to render such an opinion."

In January 2019, Colton issued notice of breach of promissory note stating that Eagle was required to provide "independent audited financial statements on an annual basis." It claimed Eagle "has not submitted an independent audited financial statement to date, as required." As a result, Colton claimed Eagle was "in breach" of the note and would be in default unless Eagle cured it "by providing an independent audited financial

3

statement within thirty (30) days." Although Eagle disputed the notice and the requirement for a certified public accountant to issue a written opinion, it ultimately provided Colton audited financial statements and an independent auditor's report in February 2019 (and has provided them to Colton annually since then). Shortly after receiving the audited financial statements and report, Colton rescinded the notice of breach.

B. *The Yucaipa Housing Project*

In late 2023, Eagle was in advanced negotiations with the city of Yucaipa to develop a similar affordable housing project. The parties had been negotiating for nearly seven years and had concluded three consecutive exclusive negotiation agreements, with the third and final one set to expire in February 2024. The agreement provided that any disposition and development agreement would require Yucaipa city council approval and would not be enforceable based on any comments provided by city staff. Yucaipa also reserved the right "to reasonably obtain further information, data and commitments" to determine Eagle's "ability and capacity . . . to develop or operate" the project.

By October 2023, Yucaipa's housing and economic and development analyst emailed Eagle's managing partner with the update they "are super close." He stated, "I don't see this taking much longer. The hard work is behind us." Although Eagle's managing partner felt Yucaipa "would have approved" the development agreement, following discussions between Yucaipa officials and Colton officials towards the end of 2023, Yucaipa decided not to proceed with the project and allowed its exclusive negotiation agreement with Eagle to expire.

4

C.    *Eagle's Complaint*

In September 2024, Eagle filed a complaint against Colton asserting causes of action for intentional interference with prospective economic advantage, negligent interference with prospective economic relations, breach of the implied covenant of good faith and fair dealing, and defamation.  The complaint alleged Yucaipa officials "[s]uddenly . . . decided not to go forward with developing the Yucaipa Project" in December 2023.  It asserted that Yucaipa officials informed an Eagle representative that Colton "staff members had made comments to them regarding [Eagle's] purported 'default' for not providing audited financials to [Colton]."  Further, "given what they had heard about [Eagle's] exchanges with [Colton] staff, [Colton] apparently did not expect [Eagle] to live up to its obligation to repay the loan—and was therefore 'writing the loan off.' "

Eagle's complaint also asserted Eagle learned from further conversations with Yucaipa officials that it was Dabbs who "communicated to Yucaipa employees that [Eagle] had defaulted under the [n]ote and that [Colton] was writing off the loan."  It further alleged that "[t]hese derogatory statements were all false," that they resulted in the "disruption and ultimate termination of the Yucaipa Project" and "harmed Eagle's reputation in other respects."

In January 2025, Eagle filed an amended complaint that included allegations it complied with the Act.  These allegations are discussed below.

D.    *Colton's Anti-SLAPP Motion*

In March 2025, Colton filed an anti-SLAPP motion to strike Eagle's complaint arguing that its allegations arise from Colton's protected activities in connection with a matter of public interest.  Colton also argued that Eagle

was unlikely to prevail on its claims because they were barred by the Act and there was no factual or legal support for them.

In support of its motion, Colton filed a declaration from Dabbs. In it, she represented that Yucaipa's clerk contacted her in November 2023 to inquire about Colton's "cash receipts" on Eagle's "development project." Yucaipa had hired a new city manager, and his review of Yucaipa's finances raised concern about its annual structural deficits and financial position. Yucaipa officials sought information showing payments Colton received from Eagle, when the payments started, and how much had been paid, which was public information obtainable through a public records request. Dabbs provided Yucaipa with a copy of the note and opined: "The terms of repayment of the principal and interest are not, in my opinion, in the City's best interest," even though the project met community goals. Dabbs also provided a reconciliation of the note showing the starting principle was $3.48 million and the outstanding balance had increased to more than $3.6 million after 10 years.

Dabbs further declared she met Yucaipa's city manager and finance director in December 2023, and they expressed concern about Yucaipa's financial position and explained that the new city manager was exercising due diligence in investigating the Eagle project. They asked about Colton's receipts on the note and discussed the note's terms, Colton's challenges with the terms, the audit findings, and how it was cleared up with the default notice. Dabbs expressed her opinion that the note's terms were not in Colton's best financial interest because of the way residual receipts are calculated. Dabbs recommended Yucaipa draft a promissory note that would allow it to calculate what they should be receiving. Dabbs made clear her "only frustrations" had been the "compliance audit" and the residual receipts

6

issue but otherwise Eagle was "complying with the audit requirement," the senior housing project "was fully operational," and she had "no other issues" with Eagle.

In opposing Colton's anti-SLAPP motion, Eagle submitted a declaration from David E. Mlynarski stating he was hired by Yucaipa to provide services to Eagle. According to Mlynarski, he had a meeting with Yucaipa's city manager in January 2024. At that meeting, Yucaipa's city manager told him about a meeting that took place in December 2023 where Dabbs said that (i) Eagle had defaulted on the note forcing Colton to serve a notice of default, (ii) Colton was not receiving payments on the note, and (iii) Colton had written off the loan/note. Yucaipa's city manager further explained that he "was uncomfortable proceeding" with the project due to these statements.

Eagle also submitted a declaration from its managing partner. He declared that he spoke with Mlynarski and that Mlynarski told him about the meeting with Yucaipa's city manager and the statements Dabbs made.

Eagle's managing partner and Mlynarski both recalled a meeting they had with Yucaipa's city manager and other officials in April 2024. At that meeting, Yucaipa's city manager again recounted the statements made by Dabbs and noted they "led to his decision" not to recommend to Yucaipa's city council to "proceed with the . . . project on a residual receipts loan structure."

Eagle's managing partner further declared these statements were "false" and, as a result, Eagle suffered lost profits of at least $65 million.

The trial court denied Colton's anti-SLAPP motion in July 2025. Although the court found Colton met its burden of establishing that Eagle's claims arise from Colton's protected activities, the court found Eagle met its burden of showing it was likely to prevail on the merits of its claims.

7

A.    *The Anti-SLAPP Statute*

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.]  To that end, the statute authorizes a special motion to strike a claim 'arising from any act of [a] person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884.)  "A court evaluates an anti-SLAPP motion in two steps.  'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.  [Citations.]  If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." '  [Citation.]  If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson*, at p. 884.)

We review the grant or denial of anti-SLAPP motions de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)  We review timeliness for abuse of discretion.  (*Six4Three, LLC v. Facebook, Inc.* (2025) 109 Cal.App.5th 635, 645 (*Six4Three*).)

B.    *Colton's Anti-SLAPP Motion Was Timely*

Eagle argues that the trial court abused its discretion by hearing Colton's motion because it was filed late.  We disagree.

Anti-SLAPP motions to strike may be filed within 60 days of the service of the complaint or, at any later time, in the court's discretion.  (§ 425.16, subd. (f).)  Colton's anti-SLAPP motion was filed 60 days after the amended complaint.  The parties had stipulated to an extension of time to respond if an

amended complaint was not filed but did not stipulate to a response time if the amended complaint was filed.  As the court noted, no discovery had been propounded by either party, no deposition had been taken, and no trial date had been set.  Based on these facts, the trial court did not abuse its discretion when it decided to "exercise[] its discretion and . . . rule on the [anti-SLAPP] motion."  As noted, the trial court has discretion to allow a defendant to file an anti-SLAPP motion "at any . . . time upon terms it deems proper." (§ 425.16, subd. (f); *Trapp  v. Naiman* (2013) 218 Cal.App.4th 113, 122–123 [it was within the trial court's discretion to accept anti-SLAPP motion at any time upon terms it deems proper].)

      C.    *Colton's Causes of Action Arise from Protected Activity*

      1.    Relevant Legal Framework

Protected activities under the anti-SLAPP statute include "(1) any written or oral statement or writing made before . . . any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, . . . or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e).)

      " 'Like the SLAPP statute itself, the question whether something is an issue of public interest must be " ' "construed broadly." ' " ' "  (*Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1145.)  " 'We look for "the *principal thrust or gravamen* of the plaintiff's cause of action."  [Citation.]  We "do not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's

9

cause of action." [Citation.] The "critical consideration" is what the cause of action is "*based on.*" ' [Citation.]" (*Ibid.*)

Protected activities under the anti-SLAPP legislation "extends to statements and writings of governmental entities and public officials on matters of public interest and concern." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17 (*Vargas*).) Conduct and publications by a public official done in connection with a matter before a city council also constitute protected activity within an anti-SLAPP analysis. (§ 425.16, subd. (e).) "The anti-SLAPP suit statute is designed to protect the speech interests of private citizens, the public, and governmental speakers." (*Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1117.) The protections also apply to investigations and communications preparatory to bringing legal action or taking official action. (See *Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1544; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784 [activities done in anticipation of raising an issue of public concern before city council protected].)

      2.    Analysis

Colton argues that it met its burden of establishing that the conduct underlying the first amended complaint "arises from" protected activities. We agree.

Eagle's complaint includes four causes of action. The first cause of action for intentional interference with prospective economic advantage alleges Colton "communicat[ed] false statements" about Eagle's "business dealings to Yucaipa." It then specifically alleges "Dabbs communicated to Yucaipa employees that [Eagle] had defaulted under the [n]ote by failing to provide audited financial to [Colton] as demanded by the [notice of breach of

10

promissory note], and that [Colton was] writing off [its] loan to [Eagle] as a result of this alleged default." The second cause of action for negligent interference with prospective economic relations similarly alleges "Dabbs . . . intentionally met with Yucaipa employees and communicated to those employees false statements about [Eagle's] business dealings." The third cause of action for breach of the implied covenant of good faith and fair dealing alleges, "[i]n addition to the breaches described herein, [Colton] breached the implied covenant of good faith and fair dealing by issuing the [notice of breach of promissory note] demanding, under the threat of litigation, that Eagle . . . perform services regarding the associated financial statements not required under the [n]ote." Finally, the fourth cause of action for defamation once again alleges Colton "communicated false and unprivileged statements about [Eagle] to third party Yucaipa."

Each cause of action is based on Colton's analysis of its note with Eagle and its communications with Yucaipa concerning the development and financing of a senior housing project. "The prospect of commercial and residential development of a substantial parcel of . . . property . . . is plainly a matter of public interest." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1233–1234 (*Tuchscher*) [communications about exclusive negotiating agreement relating to a commercial development concerned issue of public interest]; see also *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475, 479 [statements concerning how "large residential community would be governed" involved public interest].) Communications between officials concerning a city's decision regarding a municipal contract "are reasonably considered communications 'in connection with an issue under consideration or review by a legislative . . . body' within the meaning of [section 425.16,]

11

subdivision (e)(2)." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 629.)

Here, both Colton's and Yucaipa's budgets were in the process of being reviewed and audited. A Yucaipa official contacted Dabbs to "inquire about Colton's cash receipts on the Eagle development project." Dabbs discussed with Yucaipa officials the terms of the note, Colton's "challenges with the terms," the "audit findings," and "getting it cleared up with the default notice." Colton's acts and statements in connection with the municipal financing and development of the project, including its enforcement of its note with Eagle and its conversations with Yucaipa about the note, involve matters of significant public interest to both municipal governments and local taxpayers. (§ 425.16, subd. (e); *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [a public issue includes "conduct that could directly affect a large number of people beyond the direct participants" and a "topic of widespread, public interest"].)

In *Tuchscher, supra,* 106 Cal.App.4th 1219, like here, officials from one public entity communicated with officials from another public entity about a commercial development project. (*Id.* at pp. 1232–1233.) There, this court held that the defendants' statements and writings were protected activity because the proposed commercial development project had "broad effects on the community" and was a matter of public interest. (*Id.* at p. 1233.) There, like here, the statements were made after the city council approved an exclusive negotiating agreement with the developer and while it was investigating the proposed development. (*Id.* at p. 1234.)

Similarly, *Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, applied the anti-SLAPP protections to a case involving

12

the investigation of a commercial transaction with a public entity. (*Id.* at p. 1148.) The Court of Appeal determined that a public waste contract was an issue of "significant interest to . . . local government bodies and their citizens" and that a consultant's report on the waste issue and government standards "shed light on these subjects." (*Id.* at pp. 1148–1149.)

Although Eagle alleges several of Colton's statements regarding its performance on the note were "false" and "disrupted and continue[] to cause disruption" to Eagle's relationship with Yucaipa, Colton's analysis of the note and expression of its viewpoint to Yucaipa's officials amounts to a "protected activity" within the anti-SLAPP statute. (See *Vargas, supra*, 46 Cal.4th at p. 36 ["We explicitly recognized that a governmental agency 'pursues a proper "informational" role when it . . . authorizes an agency employee to present the department's view of a [matter under consideration] at a meeting of [a private or public] organization" (italics omitted)]; *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 423 [statements made by city officials "in negotiating the contract qualifies as 'any written or oral statement or writing made in connection with an issue under consideration or review by a legislative . . . body' "].) Eagle's complaint thus sets forth "claims for relief that are based on allegations of protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396.)

D. *Eagle Cannot Establish a Reasonable Probability of Prevailing*

1. Relevant Legal Framework

Our analysis on the second step of the anti-SLAPP framework "follows a 'summary-judgment-like procedure,' where we consider the pleadings as well as supporting and opposing affidavits stating the facts upon which the liability or defense is based." (*Six4Three, supra*, 109 Cal.App.5th at p. 654.) Eagle "must demonstrate that each claim is both legally sufficient and

13

supported by a sufficient prima facie showing made with competent and admissible evidence." (*Ibid.*)

The Act establishes a detailed legal framework for when public agencies and their employees can be held liable for torts. (*Nealy v. County of Orange* (2020) 54 Cal.App.5th 594, 601.) " ' "[T]he intent of the [A]ct is to confine potential governmental liability to rigidly delineated circumstances." ' " (*Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1122.) A claim must be presented to the public entity by "(1) [d]elivering it to the clerk, secretary or auditor thereof; or (2) [m]ailing it to such clerk, secretary or auditor or to the governing body at its principal office." (Gov. Code, § 915, subd. (a).) The Act further provides: "A claim, amendment, or application shall be deemed to have been presented in compliance with this section even though it is not delivered or mailed as provided in this section if, within the time prescribed for presentation thereof, . . . [¶] . . . [i]t is actually received by the clerk, secretary, auditor or board of the local public entity." (Gov. Code, § 915, subd. (e)(1).)

The claim presentation requirement " 'is based on a recognition of the special status of public entities, according them greater protections than nonpublic entity defendants, because unlike nonpublic defendants, public entities whose acts or omissions are alleged to have caused harm will incur costs that must ultimately be borne by the taxpayers.' " (*Rubenstein v. Doe No. 1* (2017) 3 Cal.5th 903, 908.) In essence, the requirement allows public entities to engage in fiscal planning to cover potential liabilities already incurred, while also avoiding the incursion of additional liabilities for the same reasons, minimizing the overall burden to taxpayers. (*Ibid.*) "[F]ailure to allege facts demonstrating or excusing compliance with the claim presentation requirement [of the Act] subjects a claim against a public entity

14

to a demurrer for failure to state a cause of action." (*State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1239.)

        2.      Additional Factual Background

Eagle sent Colton's city attorney a letter outlining its claims in August 2024. The letter was also delivered to a Colton city council member during a meeting with Eagle's representatives to discuss its claims. According to Eagle's managing partner, "[u]pon accepting and reviewing" the letter, the city council member "stated that he was obligated to disclose" it to the city council at their next meeting and that "he intended to do so." The managing partner also represented that Eagle's representative told the city council member "I expected him to do so" and "relied upon on [his] statement that he would do so and therefore I did not deliver the [letter] to the other" city council members.

The council member, however, declared it was "not my role or practice to receive Government Claims" on behalf of Colton. He acknowledged he was "handed some documents" during his meeting with Eagle representatives but understood they were "simply supporting materials for their issue" with Colton. He stated the Eagle representatives told him "they would be visiting City Hall next," so he "did not forward or save the documents." He "never considered the documents to be a Government Claim" and denied telling them that he " 'was obligated to disclose' " the letter to the city council or that he " 'intended to do so.' " Finally, he "never delivered or presented the documents to the City Clerk's office, or at a meeting of the City Council."

In its initial complaint filed in September 2024, Eagle did not mention compliance with the Act. Following meet and confer efforts where Colton advised Eagle it was intending to file a demurrer, motion to strike, and/or anti-SLAPP motion, Eagle filed an amended complaint in January 2025

15

alleging it substantially complied with the Act when its counsel sent the letter to Colton's city attorney in August 2024. The letter was labeled a "Confidential Settlement Communication" and demanded that Colton cease and desist from sharing information about its dealings with Eagle. The amended complaint alleged a copy of the letter was handed to one member of the city council during a meeting at its "leasing center" with Eagle representatives. It also alleged on "information and belief, the August . . . letter was further received by the City's clerk, secretary, and/or auditor."

In response to Eagle's declarations, Colton's city clerk represented in a declaration that she is "responsible for accepting and processing all government claims submitted" to Colton at its principal office. She stated that "[a]t no time has a government tort claim" on behalf of Eagle "been personally served, delivered, or mailed" to Colton "at its principal office." She "never received or processed a government tort claim from [the city council member], the City Attorney, or [Eagle or its] attorney" concerning this matter.

### 3. Analysis

Eagle argues it met its burden of establishing a reasonable probability of prevailing on the merits. Regarding compliance with the Act, it argues that service of its claim on a single member of the city council qualifies as service on the governing body. We disagree.

The claim presentation requirement "reflects the Legislature's intent to precisely identify those who may receive claims on behalf of a local public entity" and that "a misdirected claim will satisfy the presentation requirement if the claim is 'actually received' by a statutorily designated recipient." (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983,

16

992 (*DiCampli-Mintz*).)  Here, without citation to case authority, the trial court simply concluded:  "A member of the city council therefore qualifies as the board who can be presented with a claim."  It further noted that because the council member was handed the letter, even though he did not recognize it as a claim, he was not required to forward it to anyone because "he is a member of the city council."

The trial court incorrectly broadened the list of statutorily authorized recipients under the Act thus denying Colton's city council an opportunity "to investigate and appropriately resolve claims and to plan for potential liabilities."  (*DiCampli-Mintz, supra*, 55 Cal.4th at p. 994.)  The Act's claim presentation provision requires actual receipt by the "board of the local public entity."  (Gov. Code, § 915, subd. (e); see also *id.*, § 900.2, subd. (a) [defining " '[b]oard' " as "the governing body of the local public entity"].)  The council member did not receive the letter while sitting as a body with the other members of the city council.  He received it while alone and off-site during a private meeting.  Additionally, the letter was not addressed to him as a city council member, nor to the city council as a whole, but instead to the city attorney at his office outside of Colton (in a different county).  A single member of the city council is not the "board" or "governing body" and delivering a letter to one member at a private meeting away from city hall, and where he did not recognize the letter as a claim and did not forward it to the city clerk or the city council, is not the equivalent of actual receipt by the "board" or "governing body."

The council member simply was not statutorily authorized to accept and process Eagle's claim against Colton.  As the Supreme Court has explained, "[t]he Legislature retains authority to determine which representatives are appropriate.  The Court of Appeal cannot override that

17

determination simply because it concludes receipt by others should be considered sufficient." (*DiCampli-Mintz, supra*, 55 Cal.4th at p. 994.) To do so, the Supreme Court agreed it would improperly " 'focus[] on the duty of a public employee in receipt of a claim to forward the claim to the proper agency, [which] inappropriately shifts responsibility for filing a claim with the proper official or body from the claimant to the public entity.' " (*Id.* at p. 996.) Much "uncertainty" would be introduced "about how and where claims must be delivered." (*Id.* at p. 997.) "Misdirected claims may be received by various departments or employees and forwarded to multiple people and places, making it difficult to determine whether the claims were actually delivered to, or received by, a department or employee charged with the overall management of claims against the county. The question of when a claim is actually received and whether a specific department or employee managed claims against a public entity would also be fodder for litigation." (*Ibid.*) The California Supreme Court concluded "[t]his result is contrary to the . . . Act's goal of eliminating uncertainty in the claims-presentation requirements." (*Ibid.*)

Moreover, the letter was labeled as a "Confidential Settlement Communication" and was not "readily identifiable" as a claim. (*Schaefer Dixon Associates v. Santa Ana Watershed Project Authority* (1996) 48 Cal.App.4th 524, 533 (*Schaefer Dixon*).) The city council member did not consider the letter to be a government claim but instead thought it was "simply supporting materials for their issue" with Colton. It directed Colton to "immediately cease and desist from making further false statements about Eagle," discussed "resolving this matter outside of formal court proceedings," and sought the attorney's "availability for a call to discuss a potential resolution." As in S*chaefer Dixon*, the letter appeared "to provide information

18

and to request negotiation of an ongoing dispute, and not to advise of imminent litigation over a 'claim.' " (48 Cal.App.4th at p. 534; *id.* at p. 537 ["Although these two letters do contain threats to sue over the money dispute, the letters were never intended and never treated by anyone as a purported . . . 'claim' "].)

Additionally, the letter was not presented to the city council, so there was no review, discussion, deliberation, consideration, evaluation, or final action taken. As a result, Eagle failed to establish it presented a claim to a statutorily designated recipient for Colton. (Gov. Code, § 915, subd. (a); *DiCampli-Mintz, supra*, 55 Cal.4th at p. 992 ["If an appropriate public employee or board never receives the claim, an undelivered or misdirected claim fails to comply with the statute"].)

Furthermore, had Eagle meant the letter to be a claim, it would have given Colton the 45 days the Act allocates a board to "act on a claim . . . after the claim has been presented." (Gov. Code, § 912.4, subd. (a).) Eagle, however, filed its initial complaint after 41 days and made no mention of complying with the Act. If Eagle did not recognize the letter as a claim until after Colton initiated a meet and confer in advance of filing a demurrer, it cannot be expected that the council member would have done so following his private meeting away from city hall. (*Schaefer Dixon, supra*, 48 Cal.App.4th at p. 537 ["had the contractor genuinely considered the letters as 'claims' . . . , it would have had to allow the agency . . . 45 days to accept or reject the claim(s). Instead, the letters demanded immediate responses"].)

Finally, Eagle's information and belief that the letter was delivered to the clerk is insufficient. "An averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim." (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1498.)

19

Because each of Eagle's claims is barred by the Act, Colton's anti-SLAPP motion should have been granted. Given this conclusion, we do not need to address the parties' remaining arguments.

DISPOSITION

The order denying the anti-SLAPP motion is reversed and the matter remanded with instructions to (1) enter an order granting the motion and (2) hold a hearing, following further briefing, to determine the amount of attorney fees to which defendants are entitled under section 425.16.

Appellants are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


McCONNELL, P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.

20